IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Matthew W. Arno,                          :
    Plaintiff    :  Civil Action 2:10-cv-00149

  v.        :  Judge Frost

Michael J. Astrue,                        :  Magistrate Judge Abel
Commissioner of Social Security,
    Defendant   :

**REPORT AND RECOMMENDATION**

Plaintiff Matthew W. Arno brings this action under 42 U.S.C. §§405(g) and

1383(c)(3)  for review of a final decision of the Commissioner of Social Security denying

his application for Disability Insurance Benefits and Supplemental Security Income

benefits.  This matter is before the  Magistrate Judge for a report and recommendation

on the parties' cross-motions for summary judgment.

**<u>Summary of Issues.</u>**

Plaintiff Matthew Arno maintains that he became disabled at age 46 by

degenerative disc disease throughout the spine, carpal tunnel in both wrists,

osteoarthritis in the left hip, and depression. The administrative law judge found that

Arno retains the ability to perform a reduced range of jobs having light exertional

demands. Plaintiff argues that the decision of the Commissioner denying benefits

should be reversed because:

- The administrative law judge failed to find plaintiff disabled pursuant to
  vocational expert testimony;
- The administrative law judge made an improper credibility finding;

- The administrative law judge failed to consider the combined effect of plaintiff's impairments; and,
- The administrative law judge failed to develop the factual record.

**Procedural History.**  Plaintiff Matthew W. Arno filed his application for disability insurance benefits on June 12, 2006, alleging that he became disabled on April 18, 2006, at age 46, by degenerative disc disease of the cervical, lumbosacral and thoracic spines, bilateral carpal tunnel syndrome status-post release on the right, left hip osteoarthritis, and depression.  (R. 13, 110-119, 225-229.)  The application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On April 24, 2009, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified.  (R. 27.)  A vocational expert also testified.  On May 15, 2009, the administrative law judge issued a decision finding that Arno was not disabled within the meaning of the Act.  (R. 22.)  On January 4, 2010, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (R. 1-3.)

**Age, Education, and Work Experience.**  Matthew W. Arno was born October 17, 1959.   (R. 110.) He has a high school education.  (R. 138.)  He has worked as a forklift operator, a manager of an auto parts store, and a supervisor in an industrial cleaning company.  He last worked April 18, 2006.  (R. 133.)  Arno was fired from his job as a

2

supervisor in April 2006 after he failed a drug test for cocaine. He testified that he took

the cocaine to alleviate his pain. (R. 36.)

**Plaintiff's Testimony.**  The administrative law judge fairly summarized Arno's

testimony as follows:

> The claimant testified that he lives with his fiancé. He performs few chores
> at home. He spends much of his day ling in bed or on the couch. The pain
> is in his neck, back, left hip, and hands. It is constant, but is aggravated by
> exertion. He rated the pain as ranging from 4-9 on a scale of 0-10, with 10
> being the highest level of pain (Exhibit 12E, page 2). He takes many
> medication (Exhibit 19E, page 2). They relieve some of his symptoms, but
> do not eliminate them. He testified that one of his medications causes
> short-term memory loss as a side effect. He has undergone surgery for his
> neck and right carpal tunnel syndrome. He has received epidural steroid
> injections for his cervical and thoracic spines. He tries to avoid exerting
> himself in order to alleviate his pain.

(R. 19.)  Regarding his neck, Arno testified that "[o]ther than limited mobility," it was

"okay." (R. 39.)  He has constant, burning pain in his left hip. (R. 37.) He also has pain in

the center of his lower back and in both hands. (R. 38.) The pain in his right hand is

more severe than in the left. Arno testified that he had carpal tunnel release surgery on

his right hand, but it did not alleviate much of the pain. Consequently, he opted not to

have surgery on his dominant left ha hand.  (R. 31 and 38.)  Other than limited mobility,

Arno has had no problems with his neck since his August 2004 surgery. (R. 39.) He has

a cane and a walker but does not use either. (R. 52.) One of his medications, Gabapentin,

a stool softener, causes him short term memory loss.  (R. 42.)

Arno testified that he lived in a trailer with his fiancé and her two sons, who

were ten and fifteen.  (R. 31 and 42.) His fiancé works as a truck driver. (R. 32.) Arno

goes to the grocery store with his boys, who then bring the groceries in. (R. 42-43.) Even lifting a gallon of milk caused him so much back pain that he needed to lie on the couch for a couple of hours. (R. 42-43). Arno testified that he could stand for no more than fifteen minutes at a time, sit for twenty minutes at a time, and walk no more than a quarter of a mile. (R. 33 and 43-44.) He could walk up stairs without any problems, but going down was more difficult. (R. 45).

Arno provided the following testimony about his daily activities. He normally woke up at 5 a.m. to ensure that the older boy had risen, then would go back to bed until about 7 a.m., when would then rise again to make sure the younger boy was up, had his breakfast, and had "the right clothes on." (R. 47.) He spent the remainder of the day lying on the couch. (R. 48.) He cooked meals, took care of his own grooming and washing, and did the boys' laundry. (R. 48.) The boys did the dishes, vacuumed, and did yard work. (R. 48-49.)

Arno testified that he did not really have a problem with depression, but sometimes he got depressed because he did not have any income. (R. 45.) Most of the time, he had no difficulty with concentration. (R. 46.)

**Medical Evidence of Record.**  The administrative law judge's decision fairly sets out the relevant medical evidence of record.  This Report and Recommendation will only briefly summarize that evidence.

**Physical Impairments.**

4

<u>Michael B. Shannon, M.D.</u> On August 19, 2004, Dr. Shannon performed an anterior cervical discectomy and fusion plating at C4-5 based on a ten-year history of pain in his neck. The pain had progressed into his shoulders. In the past year, he had pain in his right arm associated with numbness and tingling which recently progressed into his left arm causing difficulty with balance, walking, and going up and down stairs. An MRI of the cervical spine revealed significant stenosis, disc herniation at C4-5 with cord compression, and some cord edema at C5-6. He had weakness in both upper extremities. He had hyperreflexia in all four extremities. Following surgery, plaintiff did well. (R. 225-29.)

On August 31, 2004, plaintiff presented at the emergency room with complaints of neck pain. (R. 235-36.) Arno complained of pain in his neck radiating into his left arm. He was instructed to follow up with his surgeon.

In a September 14, 2004 letter to Dr. Forrestal, Dr. Shannon indicated that plaintiff had an episode of severe pain and muscle spasm in his neck and shoulders approximately two weeks after the surgery. The pain had since resolved and was attributed to plaintiff "overdoing" it. He still had some numbness in his right hand, but he had good range of motion in his neck. His strength and reflexes were also good. (R. 313.)

On December 10, 2004, Arno presented at the Genesis Healthcare System Center for Occupational and Outpatient Rehabilitation Center for a functional capacity evaluation. (R. 242.) Because of his recent cervical surgery he was on light duty

restrictions and unable to undergo evaluation. Arno rated his current pain as a 3 on a ten point scale, indicating moderate pain, although over the past 30 days he had experienced pain levels as high as 8 or 9. (R. 249.) He also indicated that he was currently experiencing aching, troublesome, and nagging pain. (R. 251.) He relied on pain medications to be comfortable 75-80% of the time. His pain interfered with his personal care 25-30% of the time. He did not perform any lifting. (R. 252.)

On December 31, 2008, Dr. Shannon performed a endoscopic release for right carpal tunnel syndrome. (R. 238-41.) On January 28, 2009, Dr. Shannon performed an endoscopic release of left carpal tunnel syndrome (R. 523-24.)

<u>Robert J. Thompson, M.D.</u> Dr. Thompson evaluated plaintiff for the pain clinic. He noted that Arno had been experiencing low back pain and left hip pain for some time. Arno described the pain as a burning, constant, dull ache that was aggravated by stairs, walking, or driving. The more he was up, the worse his pain was. A July 9, 2004 MRI of his lumbar spine revealed a disk protrusion with lumbar stenosis at T11-12. Dr. Thompson diagnosed left hip pain of undetermined etiology and disk herniation at T11-12. (R. 255-56.)

<u>Wevelina Worwag, M.D.</u> On December 22. 2004, Dr. Worwag evaluated plaintiff. Arno complained of left groin pain that started in his back. Arno indicated he was miserable and the pain sometimes gave him the sensation of a pulled muscle. He described the pain as a deep, burning ache.

Arno walked with obvious discomfort on the left leg. He looked very tense. His shoulders were elevated, and his head was tilted to the right. He appeared to be in pain. On physical examination, his lumbar range of motion was unrestricted. He could bend and extend without problems or pain. He had no weakness and no sensory deficits. Straight leg raise was negative. Deep tendon reflexes were 5/5 in the knee jerk and ankle jerk. Shoulder girdle revealed very tense right sternocleidomastoid muscle, which likely produced the tilt of his head. He had multiple tender spots in the trapezius muscle.

Dr. Worwag diagnosed degenerative disc disease, thoracic and anxiety. She recommended pain management treatment and included thoracic epidural steroids. Dr. Worwag administered a steroid injection. (R. 286-87.)

On January 24, 2005, plaintiff reported 60% improvement with the previous injection. His left leg weakness had significantly improved. He was able to decrease his opiate medication. Dr. Worwag administered a second injection. (R. 285.)

On May 5, 2005, Dr. Worwag administered Arno's third thoracic epidural steroid injection. Arno reported that he not tolerated the methadone at all. He experienced mental clouding and significant change in his personality. (R. 277.) On July 21, 2005, Dr. Worwag indicated that plaintiff reported great improvement from his thoracic epidural injection, although he reported he had his usual pain radiating down into his left hip. His neck had shown significant improvement without injection, and his weakness had resolved. (R. 269.)

On September 1, 2005, Dr. Worwag administered a cervical epidural steroid injection. (R. 263.)

Thomas P. Forrestal, M.D. On February 10, 2004, Arno complained of swelling in his right knee and continued problems with his left hip. Plaintiff also complained of muscular pain in his shoulder and tingling, burning, and numbness in his right hand. Dr. Forrestal diagnosed unspecified arthropathy in the pelvic region and thigh and unspecified arthropathy in other unspecified sites. (R. 342-44.) In March and April 2004, Arno continued to complain of muscular pain, tingling, burning and numbness in his right hand, and pain in his hip. Dr. Forrestal noted that there was disturbance of the skin sensation. (R. 333-39.) On April 28, 2004, Arno complained of neck stiffness and soreness in addition to muscular pain and continued problems with his right hand. (R. 329.) On May 24, 2004, plaintiff complained of stiffness, soreness, and pain in his neck, back pain, and tingling, burning, and numbness in his lower left extremity and right upper extremity. Dr. Forrestal diagnosed a diffuse cervicobrachial syndrome and lumbago. (R. 325.) Plaintiff made similar complaints in July 2004 through March 2005. (R. 322, 317, 314, 310, 305, 302, 299, 296.) On February 22, 2006, plaintiff complained of neck stiffness, soreness and pain, muscular pain in his left hip, leg pain, back pain, and tingling, burning and numbness in his lower left extremity and right upper extremity and left groin. He also had difficulty urinating. (R. 293.)

A March 1, 2004 x-ray of plaintiff's right knee was unremarkable. (R. 351.) A March 6, 2004 electromyography was consistent with right C6 cervical radiculopathy.

8

(R. 350.) A March 11, 2004 x-ray of plaintiff's pelvis showed some calcification of the right iliac artery, but no other abnormalities were found. (R. 349.) An April 14, 2004 MRI of Arno's cervical spine revealed significant broad based disc herniation at the C4-5 level which compressed the cord with some cord edema. A smaller herniation was present at C5-6, which was central and perhaps slightly to the right of the midline. This herniation mildly effaced the cord. (R. 347.) A July 9, 2004 MRI of the lumbosacral spine showed disc protrusion and lumbar spinal canal stenosis at the T11-12 level. (R. 345.)

A October 12, 2006 x-ray of Arno's lumbar spine showed minor hypertrophic spurring. (R. 357.) An October 12, 2006 x-ray of his cervical spine showed progressive changes at the C4-5 and C5-6 levels following discectomy procedures at the C4-5 and C5-6 levels. There was residual foraminal encroachment at the levels, particularly to the right. (R. 358.)

Mark E . Weaver, M.D.  On November 16, 2006, Dr. Weaver examined Arno at the request of the Bureau of Disability Determination. Arno reported that in 2003, he had been injured at work when he walked into a beam. He required cervical fusion surgery. He returned to work, but he continued to have problems.  Arno complained of a constant dully achy pain and stiffness in his neck and low mid back area with pain radiating from his neck intermittently into his right arm. He experienced decreased coordination and strength in his right hand with constant numbness. Arno also complained of problems with pain and stiffness in his left hip. The combined effect of his neck, back, and hip problems limited him to sitting, standing, or walking for only

about 15 minutes at a time before needing to change positions or rest. He was limited to light lifting and carrying.

On physical examination, Arno walked with a stiff gain and left limp. Inspection of the upper and lower extremities showed some atrophy of the musculature of the right upper extremity with measurements as follows: the upper arms measure 11 inches on the right, 12 inches on the left; the forearms measured 10.5 on the right, 11.5 inches on the left. Dr. Weaver noted that Arno was left hand dominant. Strength testing was consistently weak in the muscle groups of the right upper extremity compared to the left in manual muscle testing. Grip strength on the right hand was less than on the left by dynamometer test. Arno had tenderness on the left hip by goniometer measure with active motion normal in the remaining joints of the extremities. There was no other tenderness, crepitus, effusion, or ligamentous laxity noted in the joints of the extremities. Strength testing of the left hip was ratchety and inconsistent with pain inhibition and giving way in manual muscle testing. Strength testing was satisfactory in all muscle groups of the lower extremities and the left upper extremity. (R. 361-64.) Dr Weaver summarized his medical assessment as follows:

> In view of his neck, right upper extremity, back and left hip problems he would probably be limited in the performance of physical activities involving prolonged sitting, standing, walking, climbing, handling objects with his right hand, travel and repetitive or heavy lifting and carrying. He would probably be able to perform physical activities involving occasional light lifting and carrying, handling objects with his left hand, hearing, speaking, following directions in environments that would allow him the opportunity to change positions from sitting to standing and vice versa periodically with occasional walking.

(R. 364.)

Department of Veterans Affairs. An August 14, 2006 radiology report indicated that Arno had mild narrowing of the hip joint articulation associated with minimal sclerosis of the superior acetabulum. No other osseous or articular abnormality was seen. He was diagnosed with mild osteoarthritis. (R. 383.) An August 14, 2006 radiology report indicated that his spine had tiny marginal enthesophytes at several levels. There was no other evidence of significant degenerative disc disease. The lumbar facet joints had mild hypertrophy and sclerosis. The vertebral bodies were normal in height. Arno was diagnosed with mild diffuse lumbar spondylosis with minimal degenerative disc disease. (R. 384.)

On August 14, 2006, plaintiff underwent an orthopedic surgery consultation because of his low back pain. Plaintiff identified his pain as a 6 or 7 on a ten point scale. On physical examination, Arno showed obvious signs of discomfort. On the dorsal thoracolumbar area there was a left paraspinal muscle spasm evident on the left side in the L2 region. He was exquisitely tender to palpation in the region with no midline tenderness, deformity or step off. Forward flexion and lateral bending were somewhat decreased. Extension was limited to about 10 degrees.  (R. 412-13.)

On September 18, 2006, Arno complained of low back pain radiating into his bilateral thighs, worse on the left. His bilateral lower limb reflexes were very brisk, and he had clonus at both ankles. The clonus and "legs jumping" had been present since the early 1990s. He denied having numbness or tingling in his lower limbs. He reported

11

steroid injections had not provided him with relief. (R. 409.) Following an EMG, Dr. Simek diagnosed remote right C6 radiculopathy. He had a normal bilateral lower limb EMG, and there was no EMG evidence of lower limb radiculopathy or myelopathy. (R. 411.)

On November 30, 2006, Arno was issued a straight cane. (R. 393.) Arno had a consultation with the pain clinic because of complaints of pain in his left hip. He had normal lordosis of the lumbar spine and midline facet tenderness over T12. His pain increased with deep palpation of paraspinal, mostly on the left thoracic. He also had in increased in pain with flexion, extension, side-bending and rotation. His left hip was tender to palpation and range of motion. (R. 401.)

A February 1, 2007 MRI of Arno's lumbar spine revealed degenerative disc disease at T11-T12 with mild central canal stenosis, degenerative disc disease at L4-L5 causing moderate left-sided neural foraminal narrowing and moderate to severe right-sided neural foraminal narrowing. (R. 382-83.)

A February 27, 2008 MRI of plaintiff's neck and spine showed postoperative changes with discectomies at C4-C5 and C5-C6. Stenosis was present at C4-C5 and C5/6. There appeared to be edema within the cord at C4-C5. Disc bulging at C6-C7 was present with only mild stenosis. (R. 479-80.) Foraminal narrowing was seen bilaterally at C4-C5, C5-C6, and C6-C7. (R. 481.) An April 18, 2008 radiology report of plaintiff's hips and pelvis were normal (R. 479.)

On April 18, 2008, plaintiff complained of chronic pain in his neck and low back and discomfort in the left groin area. The pain in his groin did not radiate. He had difficulty with ambulation. Although he used a cane, the cane exacerbated his discomfort. At home, he used a walker. Arno also complained of intermittent paresthesias on his upper extremities, with the right being more symptomatic than the left. Extensive rehabilitation in the past gave him little improvement. On physical examination, Arno's lumbar spine was markedly limited due to stiffness and pain. He complained of pain with any motion in the left hip. The doctor noted that there was some active resistance. There was no focal point tenderness in the hip or groin area. Examination of the lower extremities revealed 1+ knee and ankle jerks. He generated good resistance on manual muscle testing in the lower extremities. Straight leg raise test was remarkable for some back and groin pain on the left. His feet were warm to the touch. There was no swelling in the lower extremities. (R. 496-97.)

Elizabeth Das, M.D. On December 6, 2006, Dr. Das completed a physical residual functional capacity assessment. Dr. Das concluded that Arno could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds. He could stand or walk about 6 hours in an 8-hour day, and sit with normal breaks for about 6 hours in an 8-hour day. Arno was limited in his ability to push and pull in his upper extremities. Dr Das noted that Arno's cranial nerves were intact. Arno had some atrophy in his right upper extremity and tenderness in his left hip. He also had weak right hand grip, although he

13

is able to use both hands for basic grasping and handling of objects. He had a mild, involuntary muscle spasm in his neck. His gait was normal.

Arno could occasionally climb ladder, ropes, and scaffolds. He could also occasionally stoop, crouch or crawl. (R. 471-78.)

Jamie Coburn, OTR/L. Jamie Coburn, an occupational therapist, completed a May 20, 2008 functional capacity evaluation and  indicated that Arno had the physical abilities to perform medium work. He had limitations in standing and walking, and he required intermittent rest breaks because of pain in his left hip. (R. 526.) Arno ambulated with a mild antalgic gait pattern and used a straight cane at times. He had a breakdown of safe gait pattern while performing sub-maximal treadmill test for aerobic capacity. Arno requested that the test be terminated because of pain in his left hip and low back. (R. 529.)

**Psychological Impairments.**

Prabha Tripathi, M.D. Dr. Tripathi, a psychiatrist, evaluated plaintiff. (R. 353-55.) On mental status examination, plaintiff was fairly cooperative and answered the questions to the best of his ability. His mood was described as "okay." He was slightly depressed when he talked about not having enough money and not being able to work. Arno did not exhibit signs of anxiety. His speech was fairly relevant and coherent, without any evidence of pressure, retardation, neologism, circumstantiality or tangentiality. His thought processes were normal. There was no evidence of

14

hallucinations. He was oriented in all three spheres, and his memory was described as "okay." His insight and judgment were adequate.

Arno described his daily activities as waking up between 6:30 am and 11:00 a.m. When he gets up, he goes to dumpsters to find junk that he can sell to earn money. Some days he lies on the couch all day. He reported he would be happy if he could go to work and earn some money.

Dr. Tripathi diagnosed a depressive disorder secondary to his physical problems and assigned a Global Assessment of Functioning ("GAF") score of 40. (R. 355.)

David Demuth, M.D. On December 1, 2006, Dr. Demuth completed a mental residual functional capacity assessment. With respect to his understanding and memory, plaintiff was moderately limited in his ability to understand and remember detailed instructions. With respect to his sustained concentration and persistence, Arno was moderately limited in his abilities to carry out detailed instructions, to maintain attention and concentration for extended periods, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Arno was not significantly limited in the areas of social interaction or adaptation. Dr. Demuth concluded that plaintiff was capable fo performing simple, uncomplicated tasks. (R. 451-52.) Dr. Demuth concluded that Arno had depression secondary to his physical problems. (R. 458.) On March 12, 2007, Gerald Klyop, M.D.

reviewed the evidence in the file and affirmed Dr. Demuth's assessment. (R. 469.)

### Administrative Law Judge's Findings.

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.  The claimant has not engaged in substantial gainful activity since April 18, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: degenerative disc disease of the cervical spine that is status-post an August 2004 surgery; degenerative disc disease of the lumbosacral and thoracic spines; bilateral carpal tunnel syndrome that is status-post release on the right; left hip osteoarthritis; and depression (20 CFR 404.1520(c) and 416.9209c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404. 1526, 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the requirements of work activity except as follows: He can lift/carry/push/pull up tp 20 pounds occasionally and 10 pounds frequently. He can stand and/or walk for six hours in an eight-hour workday. He can occasionally stoop, kneel, crouch, and climb ramps or stairs. He is unable to crawl or to climb ladders, ropes, or scaffolds. He is unable to perform firm, forceful grasping with the right hand beyond the limits set forth above for lifting and carrying. He is unable to work at unprotected heights or to work around hazardous machinery. He is able to remember and carry out only short and simple instructions. Any job he could perform should not require more than ordinary and routine changes in the work setting or duties. He is able to make only simple work-related decisions.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on October 17, 1959, and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1560a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 18, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 15-22.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id.  LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366

(6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining

whether the Commissioner's decision is supported by substantial evidence, the Court

must "'take into account whatever in the record fairly detracts from its weight.'"  *Beavers*

*v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and*

*Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**   Plaintiff argues that the decision of the Commissioner

denying benefits should be reversed because:

The administrative law judge failed to find plaintiff disabled pursuant to vocational

expert testimony;

- The administrative law judge failed to find plaintiff disabled pursuant to
  vocational expert testimony. The vocational expert testified that Arno would
  be precluded from all work based on his need to recline for two hours a day
  during the workday. Plaintiff also argues that the administrative law judge's
  hypothetical presented to the vocational expert was incomplete, and therefore
  his decision is not supported by substantial evidence. A May 2008 functional
  capacity evaluation concluded that plaintiff required intermittent breaks
  throughout the day. When the vocational expert was presented with this
  additional limitation, she testified that the jobs that plaintiff could perform
  would be reduced significantly.

18

- <u>The administrative law judge made an improper credibility finding</u>. The administrative law judge erred when he concluded that plaintiff's statements concerning the intensity, persistence and limiting effects were inconsistent with his residual functional capacity assessment. Plaintiff argues that the May 2008 functional capacity evaluation showed that he would be unable to sustain work activities due to pain. The examiner expressed no doubts or concerns about Arno's credibility and noted that Waddell's signs were negative. Plaintiff also argues that the administrative law judge should have obtained medical expert testimony to assist him in interpreting evidence rather than relying on his own lay interpretation of the February 2008 MRI. The MRI showed disc bulging, although "only mild stenosis" was reported. Plaintiff maintains that the administrative law judge failed to explain how pain resulting from mild stenosis would differ from disc bulging pain. The administrative law judge also relied on his own lay opinion when he concluded that Arno's hip osteoarthritis was mild. The record demonstrates that plaintiff made persistent attempts to obtain pain relief. He increased his medications and sought referrals to specialists. He also underwent physical therapy, injections, and surgical interventions.

- <u>The administrative law judge failed to consider the combined effect of plaintiff's impairments.</u> Plaintiff argues that the administrative law judge failed to consider the impact of his degenerative disc disease of the cervical

spine, status post an August 2004 surgery; degenerative disc disease of the lumbosacral and thoracic spines; bilateral carpal tunnel syndrome, status post release on the right; left hip osteoarthritis; and depression. Plaintiff was assigned a GAF score of 40, which indicates major impairments in several areas, such as work, family relations, judgment, thinking, or mood. Plaintiff maintains that a GAF of 40 indicates an inability to work. Plaintiff argues that the administrative law judge should have considered the combined effect of plaintiff's impairments.

- The administrative law judge failed to develop the factual record. Plaintiff maintains that the administrative law judge failed to present a complete hypothetical to the vocational expert and failed to consider the subsequent vocational testimony that directs a finding that Arno is precluded from all work. Plaintiff further argues that a medical expert should have called to evaluate the medical record and plaintiff's allegations of pain.

**Analysis.**

Accuracy of Hypothetical Given Vocational Expert: Legal Standard.  Plaintiff argues that the Administrative Law Judge's hypothetical to the vocational expert was not supported by substantial evidence because a May 2008 functional capacity evaluation concluded that plaintiff required intermittent breaks throughout the day

In determining whether a claimant is disabled, an administrative law judge makes a residual functional capacity determination.  That finding is an "assessment of

the claimant's remaining capacity for work" once his or her limitations have been taken

into account. 20 C.F.R. § 416.945. It is "a more complete assessment of her physical and

mental state and should include an 'accurate[ ] portray[al] [of her] individual physical

and mental impairment[s].' *Varley,* 820 F.2d at 779; *Myers v. Weinberger,* 514 F.2d 293,

294 (6th Cir.1975) (per curiam)." *Howard v. Commissioner of Social Security,* 276 F.3d 235,

239 (6th Cir. 2002).

When a vocational expert testifies, the administrative law judge asks the expert

to assume certain facts about the claimant's work abilities. The facts in this hypothetical

are the administrative law judge's residual functional capacity findings. The

administrative law judge must accurately state each limitation that affects the claimant's

ability to work. If there is not substantial evidence supporting the limitations the

administrative law judge includes in the hypothetical to the vocational expert, then the

expert's testimony is not substantial evidence supporting the Commissioner's decision

denying benefits. *Howard,* 276 F.3d at 240-42. If a limitation that substantially affects

the claimant's ability to work is established by uncontroverted medical evidence, it is

error for the administrative law judge to omit this limitation from the hypothetical

given to the vocational expert. 276 F.3d at 242.

Accuracy of Hypothetical Given Vocational Expert: Discussion. The

administrative law judge concluded that Arno retained the residual functional capacity

to perform work activity as follows:

> He can lift/carry/push/pull up to 20 pounds occasionally and 10 pounds
> frequently. He can stand and/or walk for six hours in an eight-hour

workday. He can only occasionally stoop, kneel, crouch, and climb ramps and stairs. He is unable to crawl or to climb ladders, ropes, or scaffolds. He is unable to perform firm, forceful grasping with the right hand beyond the limits set forth above for lifting and carrying. He is unable to work at unprotected heights or to work around hazardous machinery. He is able to remember and carry out only short and simple instructions. Any job he could perform should not require more than ordinary and routine changes in the work setting or duties. He is able to make only simple work-related decisions.

(R. 18-19.)   Because the administrative law judge did not find the restrictions in the May 2008 evaluation to be warranted, he was not required to include the additional restrictions into his hypothetical to the vocational expert.

Credibility Determinations: Controlling Law. Pain is an elusive phenomena. Ultimately, no one can say with certainty whether another person's subjectively disabling pain precludes all substantial gainful employment.  The Social Security Act requires that the claimant establish that he is disabled.  Under the Act, a "disability" is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months.  . . ."  42 U.S.C. §423(d)(1)(A) (emphasis added).

Under the provisions of 42 U.S.C. §423(d)(5)(A):

An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be

22

furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.  Objective medical evidence of pain or other symptoms established by medically acceptable clinical or other laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability.

The Commissioner's regulations provide:

(a) *General*.  In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  By objective medical evidence, we mean medical signs and laboratory findings as defined in §404.1528(b) and (c).  By other evidence, we mean the kinds of evidence described in §§404.1512(b)(2) through (6) and 404.1513(b)(1), (4), and (5) and (e).  These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work.  We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.  However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.  In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect

23

> you.  (Section 404.1527 explains how we consider opinions of your
> treating source and other medical opinions on the existence and
> severity of your symptoms, such as pain.)  We will then determine
> the extent to which your alleged functional limitations and
> restrictions due to pain or other symptoms can reasonably be
> accepted as consistent with the medical signs and laboratory findings
> and other evidence to decide how your symptoms affect your ability
> to work.

20 C.F.R. §404.1529(a).

In *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986) the Sixth Circuit established the following test for evaluating complaints of disabling pain.  First, the Court must determine "whether there is objective medical evidence of an underlying medical condition."  If so, the Court must then

> examine:  (1) whether objective medical evidence confirms the
> severity of the alleged pain arising from the condition; or (2) whether
> the objectively established medical condition is of such a severity that
> it can reasonably be expected to produce the alleged disabling pain.

*Duncan*, 801 F.2d at 853.  Any "credibility determinations with respect to subjective complaints of pain rest with the ALJ."  *Siterlet v. Secretary of Health and Human Services*, 823 F.2d 918, 920 (6th Cir. 1987).

<u>Credibility Determination: Discussion</u>.  With respect to evaluating Arno's complaints of pain, the administrative law judge stated:

> The claimant's allegations are credible only to the extent consistent with
> the residual functional capacity finding of this decision. The claimant
> alleges disabling spinal problems, yet a functional capacity evaluation
> performed in May 2008 indicated he can perform physical abilities to the
> medium physical demand level (Exhibit 15F, page 1). Additionally, it was
> noted in December 2008 that he had done well with his neck and had had
> just a little bit of lower back pain issues (Exhbit 3F, page 4). The February
> 2008 MRI showed disc bulging at C6-7, but there was only mild stenosis

24

> (Exhibit 12F, page 2). As for his hip osteoarthritis, it was shown to be mild (Exhibit 9F, pages 15-16). He was noted to be doing well in January 2009 after his carpal tunnel surgery (Exhibit 14F, page 1). At the hearing, the claimant denied problems with depression beyond being depressed over having no income. He was receiving no treatment for depression.

(R. 20.) The administrative law judge gave significant weight to the state agency assessment that found that Arno could perform light exertional work with some limitations for his mental abilities. The administrative law judge determined that the results of the February 2007 MRI were consistent with the state agency assessment. The administrative law judge noted that the February 2007 MRI showed moderate to serve right neural foraminal narrowing but plaintiff's symptoms were on the left. The administrative law judge gave some weight to Dr. Waver's opinion. Dr. Weaver opined that plaintiff was limited to work at the light exertional level, which was consistent with the administrative law judge's residual functional capacity assessment. The administrative law judge noted that he found plaintiff had more limitations than the May 2008 functional capacity evaluation indicated. The May 2008 evaluation indicated that plaintiff was capable of working at a medium exertional level, but the administrative law judge limited Arno to light work.

Contrary to plaintiff's argument, the administrative law judge was not improperly interpreting the objective medical evidence. Plaintiff points to a May 2008 evaluation that was less restrictive than the residual functional capacity assessment formulated by the administrative law judge. The administrative law judge considered plaintiff's allegations of pain in addition to the objective medical evidence. There is

substantial evidence in the record to support the administrative law judge's conclusion that the objective medical evidence did not support Arno's allegations of disabling pain.

Combined impairments.  The Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity.  42 U.S.C. § 423(d)(2(B).  *See*  42 U.S.C. § 1382c(a)(3)(B); *Nash v. Sec'y of Health and Human Serv.*, 59 F.3d 171 (Table) 1995 WL 363381, at *2 (6th Cir. June 15, 1995);  *Davis v. Shalala*, 985 F.2d 528, 533 (11th Cir. 1993) (citing case law which states that the claimant "should be evaluated as a whole person, and not evaluated in the abstract as having several hypothetical and isolated illnesses.").  The Commissioner's regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 404.1523.

When an administrative law refers to a claimant's combined impairments, he has met his obligation to consider the claimant's impairments in combination.  *See, Loy v. Secretary of Health and Human Services,* 901 F.2d 1306, 1310 (6th Cir. 1990).

The administrative law judge considered plaintiff's combined impairments as evidenced by his residual functional capacity assessment that took into account all of

26

his physical impairments in addition to limiting him to work that only required short and simple instructions and did not require more than ordinary and routine changes in the work setting or duties. The administrative law judge also limited him to work that only required simple decisions. The administrative adopted these limitations despite his conclusion that the consultative mental examiner's opinion was entitled to little or no weight. Because the administrative law judge formulated an residual functional capacity assessment that incorporated all of plaintiff's physical and mental impairments, his decision is supported by substantial evidence in the record.

Failure to Develop the Record. The primary function of a medical expert is to explain medical terms and the findings in medical reports in more complex cases in terms that the administrative law judge, a who is not a medical professional, may understand. *See, Richardson v. Perales,* 402 U.S. 389, 408 (1972).  The Commissioner's regulations provide that an administrative law judge "may also ask for and consider opinions from medical experts on the nature and severity of [the claimant's] impairment(s) and on whether [the] impairment(s) equals the requirements of any impairment listed in appendix 1 to this sub-part." 20 C.F.R. § 404,1527(f)(2)(iii).  The Commissioner's operations manual indicates that it is within the administrative law judge's discretion whether to seek the assistance of a medical expert.  HALLEX I-2-5-32 (September 28, 2005).  "The primary reason an ALJ may obtain ME opinion is to gain information which will help him or her evaluate the medical evidence in a case, and determine whether the claimant is disabled or blind." *Id.*  The operations manual

27

indicates that an administrative law judge "may need to obtain an ME's opinion" in the

following circumstances:

- the ALJ is determining whether a claimant's impairment(s) meets a listed impairment(s);
- the ALJ is determining the usual dosage and effect of drugs and other forms of therapy;
- the ALJ is assessing a claimant's failure to follow prescribed treatment;
- the ALJ is determining the degree of severity of a claimant's physical or mental impairment;
- the ALJ has reasonable doubt about the adequacy of the medical record in a case, and believes that an ME may be able to suggest additional relevant evidence;
- the medical evidence is conflicting or confusing, and the ALJ believes an ME may be able to clarify and explain the evidence or help resolve a conflict;
- the significance of clinical or laboratory findings in the record is not clear, and the ALJ believes an ME may be able to explain the findings and assist the ALJ in assessing their clinical significance;
- the ALJ is determining the claimant's residual functional capacity, *e.g.*, the ALJ may ask the ME to explain or clarify the claimant's functional limitations and abilities as established by the medical evidence of record;
- the ALJ has a question about the etiology or course of a disease and how it may affect the claimant's ability to engage in work activities at pertinent points in time, *e.g.*, the ALJ may ask the ME to explain the nature of an impairment and identify any medically contraindicated activities; or
- the ALJ desires expert medical opinion regarding the onset of an impairment.

HALLEX I-2-5-34 (September 28, 2005).  An administrative law judge's determination of

whether a medical expert is necessary is inherently a discretionary decision.  *Nebra A.*

*Simpson v. Commissioner of Social Security,* 2009 WL 2628355 (6th Cir. August 27,

2009)(unreported) at *8. An administrative law judge abuses his discretion only when

the testimony of a medical expert is "required for the discharge of the ALJ's duty to

28

conduct a full inquiry into the claimant's allegations. *See* 20 C.F.R. § 416.1444."

*Haywood v. Sullivan*, 888 F.2d 1463, 1467-68 (5th Cir. 1989).

Here the administrative law judge did not abuse his discretion. His decision included a thorough recitation of the evidence and provided a thorough, well-documented findings supporting the conclusion

From a review of the record as a whole, I conclude that there is substantial evidence supporting the administrative law judge's decision denying benefits. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED.** It is **FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be **DENIED** and that defendant's motion for summary judgment be **GRANTED.**

If any party objects to this Report and Recommendation, that party may, within ten (10) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

s/Mark R.  Abel
United States Magistrate Judge